b

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

JANA KAYE TRAHAN,                            CIVIL DOCKET NO. 2:23-CV-00302
Plaintiff

VERSUS                                              JUDGE JAMES D. CAIN, JR.

COMMISSIONER OF SOCIAL              MAGISTRATE JUDGE PEREZ-MONTES
SECURITY,
Defendants

---

## REPORT AND RECOMMENDATION

Before the Court is an appeal by Jana Kaye Trahan ("Trahan") from the final decision of the Commissioner of Social Security (the "Commissioner") denying her application for Social Security Disability Insurance benefits and Supplemental Security Income benefits. ECF No. 1.

Because the administrative law judge ("ALJ") committed a harmful legal error, IT IS RECOMMENDED that Trahan's appeal (ECF No. 1) be GRANTED, the final decision of the Commission be VACATED, and the case be REMANDED for further proceedings consistent with this opinion.

I.    Background

A.  Procedural History

On November 20, 2019, Trahan filed a Title II application for a period of disability and disability insurance benefits. ECF No. 9-1 at 17. On August 11, 2020, Trahan filed a Title XVI application for supplemental security income. *Id.* She alleged

a disability onset date of September 24, 2019.[1] *Id.* at 178–79, 286. Her claims were initially denied and, upon reconsideration, denied again. *Id.* at 106–09, 112–26. She requested a hearing. *Id.* at 127.

An ALJ convened a *de novo* hearing. *Id.* at 38–55. Trahan, her attorney, and a vocational expert ("VE") were present. *Id.* at 38. The ALJ found that Trahan had not been under a disability within the meaning of the Social Security Act ("SSA") from the alleged disability onset date through November 4, 2022, the date of the ALJ's decision. *Id.* at 18. The Appeals Council declined Trahan's request for review, *see id.* at 5–8, and the ALJ's decision became the final decision of the Commissioner.

Trahan appealed the Commissioner's final decision pursuant to 42 U.S.C. § 405(g). ECF No. 1.

### B. Medical Records

In December 2019, Trahan met with Dr. Nandita Chadha, M.D., ("Dr. Chadha") at the Chadha Medical Clinic. ECF No. 9-1 at 293–302. Trahan generally complained of frequent headaches, high blood pressure, racing heart, chest pain, dizzy spells, shortness of breath, heartburn, bladder incontinence, back and shoulder pain, aching muscles/joints, nervousness, impaired decision-making and concentration, memory changes, depression, difficulty relaxing and sleeping, and fatigue. *Id.* at 295. Her past medical history reportedly included high blood pressure, heart disease, arthritis, high cholesterol, and back pain. *Id.* at 293.

---

[1] The ALJ's ruling incorrectly stated that Trahan alleged a disability onset date of September 1, 2019. ECF No. 9-1 at 17.

That same month, Trahan also went to Cardiovascular Specialists in Lake Charles, Louisiana, to evaluate her chest pain. *Id.* at 308–11. She reported "a decline in her functional status" because of increased "chest pain and shortness of breath with activity." *Id.* at 308. Trahan was assessed with intermittent claudication and chest pain, and Cardiovascular Specialists ordered a stress test and echocardiogram ("EKG"). *Id.* at 309. "Her EKG was reportedly normal." *Id.* at 286.

Between January and September 2020, Trahan returned to the Chadha Medical Clinic several times. *Id.* at 322–37, 406–12. Although some of the notes for Trahan's subjective complaints are illegible, Trahan generally complained of back, knee, and ankle pain, anxiety, shortness of breath, palpitations, headaches, and swelling. *See e.g., id.* at 326, 337, 412. On at least one occasion, Trahan complained that her back pain radiated down to her legs and hips. *Id.* at 333.

In April 2020, Trahan met with Dr. Corey G. Foster, M.D., ("Dr. Foster") at Cardiovascular Specialists. *Id.* at 435. Trahan reported that she had "some improvement in her chest pain with the addition of a long-acting nitrate," but she still had "intermittent chest pain with activity." *Id.* Trahan denied having any heart failure symptoms, palpitations, presyncope, overt syncope, or claudication. *Id.*

In May 2020, Dr. Foster completed a left heart catheterization with coronary angiography. *Id.* at 433. The procedure indicated that Trahan had two-vessel coronary artery disease with a patent stent in her left anterior descending coronary artery and moderate disease in her right coronary artery. *Id.* at 434. Dr. Foster

recommended that Trahan continue an "aggressive secondary risk factor modification" for her coronary artery disease. *Id.*

In July 2020, Chadha Medical Clinic ordered and completed Doppler testing for Trahan, which was "[n]egative for left lower extremity" deep venous thrombosis. *Id.* at 348. In August 2020, Chadha Medical Clinic ordered testing for Trahan at the Pathology Laboratory. *Id.* at 344–47.

In September 2020, Trahan went to West Calcasieu Cameron Hospital complaining of a urinary tract infection, diarrhea, and bilateral lower back pain. *Id.* at 338–43, 384–93. She was diagnosed with a urinary tract infection and diarrhea. *Id.* at 387.

Between May and July 2021, Trahan met with Dr. Reynard C. Odenheimer, M.D., ("Dr. Odenheimer") several times. *Id.* at 352–66. She generally complained of lower back, neck, hip, and leg pain, migraines, bladder control issues, and poor circulation in her feet. *See e.g., id.* at 352, 358. On at least one visit, Trahan reported that her "ankles often buckle[,] causing falls," and she could "not sleep through the night." *Id.* at 359. Dr. Odenheimer's diagnostic impressions were neuropathy, radiculopathy, spinal stenosis, arthritis, migraines, and a Vitamin D deficiency. *See id.*

Dr. Odenheimer completed an electromyography that indicated mild to moderate left median neuropathy at Trahan's wrist, moderate right median neuropathy at her wrist, mild to moderate right ulnar neuropathy at her elbow, sensory motor polyneuropathy, and chronic left C-7 radiculopathy. *Id.* at 355. Trahan

4

also received magnetic resonance imaging ("MRI") of her cervical spine. *Id.* at 361–62. The MRI indicated that Trahan had central disc protrusions at her C3-C4, C5-C6, and C6-C7. *Id.* Trahan's diagnostic impressions were multilevel degenerative changes and potential reversal in her "normal lordotic curvature." *Id.* at 362.

In July 2021, Trahan met with Marilyn Holland, N.P., ("Nurse Holland") at the LC Memorial Medical Group. *Id.* at 371–73. Trahan complained of lower back, neck, chest, leg/calf, and joint pain, muscle aches, difficulty sleeping and balancing, headache, dizziness, swelling, shortness of breath, cough, indigestion, nausea, bladder incontinence, depression, anxiety, mood swings, and heat intolerance. *Id.* at 371-72. She reported that her pain began in her neck, radiated down into her lower back and legs, and interfered with her ability to "ambulate distances and perform ADLs." *Id.* She stated that she had previously received six weeks of physical therapy and had seen a chiropractor. *Id.* at 371.

Nurse Holland completed a physical examination and observed tenderness to palpation of the midline and paraspinal muscles of Trahan's cervical and lumbar spine, painful flexion and extension of her lumbar spine, positive straight leg raise for her right leg, parthesias in her right calf, and painful ambulation. *Id.* at 372. Nurse Holland reviewed imaging of Trahan's cervical spine and observed degenerative changes and loss of disc height at her L5-S1. *Id.*

In August 2021, Trahan met with Dr. Matthew Ryan Burton, M.D., ("Dr. Burton") at the LC Memorial Medical Group. *Id.* at 374–76. Trahan complained of lower back pain that radiated down her hip and into her right leg. *Id.* at 374. She

5

additionally complained of a headache; difficulty sleeping, balancing, and walking; dizziness; swelling; leg/calf, neck, and joint pain; weakness; and numbness. *Id.*

Dr. Burton completed a physical examination and observed tenderness to palpation of the midline and paraspinal muscles of Trahan's cervical and lumbar spine, painful flexion and extension of her lumbar spine, positive straight leg raise for her right leg, parthesias in her right calf, and painful ambulation. *Id.* at 375. Dr. Burton also reviewed an MRI of Trahan's cervical and lumbar spine. *Id.* He observed central disc protrusions in her cervical spine and multilevel degenerative disease in her lumbar spine. *Id.* at 375–77.

In October 2021, Trahan received an epidural steroid injection in her lumbar spine. *Id.* at 399.

In March and April 2022, Trahan returned to the Chadha Medical Clinic. *Id.* at 402–05. She complained of lower back pain that radiated down her back. *Id.* at 403. She also reported irritability, tension, headache, fear of losing control, dizziness, agitation, nervousness, depression, fatigue, sinus and chest pain, heartburn, nasal congestion, frequent urination, and feeling worthless and hopeless. *Id.* at 405.

C. <u>Administrative Hearing</u>

At her administrative hearing, Trahan testified that she previously worked a variety of construction-related jobs, including working as a construction worker, janitor, and confined space attendant. ECF No. 9-1 at 41–42. She had not worked since September 11, 2019. *Id.* at 41.

6

Trahan testified that she was able to clean her home but had to take breaks. *Id.* at 43. She further testified that she prepared meals, gave her aunt medication, and was able to drive, but she did not participate in any social activities because of her anxiety. *Id.* She reported that she had been seeing Dr. Lapetria Johnson for mental health treatment. *Id.*

Trahan's attorney then examined Trahan. *Id.* at 44–52. Trahan testified that her heart condition caused chest pain, shortness of breath, and dizziness when she did household chores. *Id.* at 44–45. She further testified that she had high blood pressure. *Id.* at 45. She reported that she had severe neck pain that radiated down her right arm to her hands, which made it more difficult to hold and grip objects. *Id.* She testified that her back pain was constant and radiated down her right leg. *Id.* at 46. She stated that neither physical therapy nor medications relieved her back pain. *Id.*

Trahan also testified to having bladder control issues, which required her to occasionally wear protective garments. *Id.* at 46–47. She further testified to having frequent migraines. *Id.* at 47–48. She stated that she had stopped taking some of her prescribed medications because they either had not helped, made her sick, or caused other adverse side effects. *Id.* at 48–49. She further testified that back injections had not helped, and she was scared to undergo surgery. *Id.* at 51–52.

Trahan then discussed her depression and anxiety. *Id.* at 49–50. She testified that she tried to "stay to [her]self as much as possible" and hated being in crowds. *Id.* at 50. She also testified that she had crying spells and difficulty sleeping. *Id.*

Trahan testified that she could sit down for approximately twenty to thirty minutes before needing to stand up because of the pain. *Id.* She testified she could only stand for forty-five minutes before needing to sit. *Id.* She testified she could walk around her block before needing to sit down. *Id.* at 51. She testified that the heaviest thing she could lift would be a ten-pound bag of potatoes if she used both hands. *Id.* She further testified that she would not be able to carry that same bag of potatoes very far. *Id.*

The ALJ then examined the VE. *Id.* at 52–55. The VE testified that Trahan's first occupation was a composite job with three components: welder helper, construction laborer, and fire watch duty. *Id.* at 52–53. Trahan's second job was classified as a commercial cleaner. *Id.* at 53.

The ALJ directed the VE to consider a person who was forty-five years old; had an eleventh grade education; had the same work experience as Trahan; was limited to light work; was limited to only occasional postural limitations; could not climb, ladders, ropes, or scaffolds; could understand, remember, and carry out simple work on a regular and continuing basis; could only have occasional interaction with coworkers and supervisors; could not interact with the public; and who needed ready access to a bathroom. *Id.* The ALJ asked whether such an individual could perform the work Trahan previously performed. *Id.* The VE testified that Trahan's past work exceeded the light residual functional capacity, and the hypothetical individual would thus be unable to perform the job as actually performed in the national economy. *Id.* at 54. The ALJ then asked if the hypothetical individual could perform other jobs. *Id.* The VE testified that the

individual could work as a collator operator, routing clerk, or merchandise marker. *Id.* at 54.

The ALJ then modified the hypothetical by adding a limitation that the individual would either need conditional work breaks lasting up to 10 minutes each hour or be off-task for up to 20% of the workday. *Id.* at 54–55. The VE testified that this hypothetical individual would be precluded from work. *Id.* at 55.

Trahan's attorney did not cross-examine the VE. *Id.*

### D. ALJ's Findings and Conclusions

The SSA promulgated a five-step sequential process to determine whether an individual is disabled. 20 C.F.R. § 404.1520(a). This process requires the ALJ to determine whether a claimant (1) is engaging in substantial gainful activity; (2) has a medically determinable severe impairment or a severe combination of impairments; (3) has an impairment or combination of impairments listed in or medically equivalent to those listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Appendix 1"); (4) has the residual functional capacity to perform her past relevant work; and (5) has the residual functional capacity, age, education, and work experience to perform any other type of work. 20 C.F.R. § 404.1520(a)(4)(i)–(v).

A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis. *See Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994) (citing *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)). To be entitled to benefits, an applicant bears the initial burden of showing she is disabled. Under the regulations, this means the claimant bears the burden of proof.

on the first four steps of the sequential analysis. Once this initial burden is satisfied, the Commissioner bears the burden of establishing that the claimant is capable of performing work in the national economy. *See Greenspan*, 38 F.3d at 237.

Here, the ALJ found that Trahan had not engaged in substantial gainful activity since her alleged disability onset date. ECF No. 9-1 at 20. The ALJ found that Trahan had the following severe impairments: degenerative disc disease, hypertension, hyperlipidemia, coronary artery disease, and depression. *Id.* But at Step Three, the ALJ determined that Trahan did not have an impairment or combination of impairments listed in or medically equivalent to one listed in Appendix 1. *Id.* at 20–23.

The ALJ then found that Trahan had the residual functional capacity to perform light work but she could only occasionally balance, stoop, kneel, crouch, and crawl; could not climb ladders, ropes, or scaffolds; needed ready access to a bathroom; could understand, remember, and carry out simple work on a regular and continuing basis; and could have occasional interaction with coworkers and supervisors but could not interact with the public. *Id.* at 23. At Step Four, the ALJ determined that Trahan did not have the residual functional capacity to perform her past relevant work. *Id.* at 30–31. At Step Five, the ALJ considered Trahan's age, education, and work experience. It determined she had the residual functional capacity to work as a collateral operator, routing clerk, or merchandise marker. *Id.* at 32.

Accordingly, the ALJ concluded that Trahan was not under a disability as defined in the SSA from the alleged onset date through the date of the decision. *Id.*

10

## II.   Law and Analysis

### A.  Scope of Review

A court's review of social security disability claims is "exceedingly deferential and limited to two inquiries: whether substantial evidence supports the ALJ's decision, and whether the ALJ applied the proper legal standards when evaluating the evidence." *Boone v. O'Malley*, No. 23-CV-40401, 2023 WL 9018388, at *1 (5th Cir. 2023) (quoting *Taylor v. Astrue*, 706 F.3d 600, 602 (5th Cir. 2012)).

"When substantial evidence supports the ALJ's findings, these findings 'shall be conclusive' and must be affirmed." *Daigle v. Kijakazi*, No. 22-CV-30721, 2023 WL 4501865, at *1 (5th Cir. 2023) (citing 42 U.S.C. § 405(g)). For the evidence to be substantial, it must be "more than a scintilla and less than a preponderance," and "of such relevance that a reasonable mind would accept it as adequate to support a conclusion." *Falco v. Shalala*, 27 F.3d 160, 162 (5th Cir. 1994) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *see also Biestek v. Berryhill*, 587 U.S. 97, 103 (2019).

"[T]he substantial evidence test does not involve a simple search of the record for isolated bits of evidence which support the [Commissioner's] decision. [The Court] must consider the record as a whole, and the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Singletary v. Bowen*, 798 F.2d 818, 823 (5th Cir. 1986). A court reviewing the Commissioner's decision "may not retry factual issues, reweigh evidence, or substitute [its] judgment for that of the fact finder." *Dellolio v. Heckler*, 705 F.2d 123, 125 (5th Cir. 1983); *see*

*also Fraga v. Bowen*, 810 F.2d 1296, 1302 (5th Cir. 1987). The resolution of conflicting evidence and credibility choices is for the Commissioner and the ALJ, rather than a court. *See Allen v. Schweiker*, 642 F.2d 799, 801 (5th Cir. 1981); *see also Daigle*, 2023 WL 4501865, at *1.

A court does have authority, however, to set aside factual findings that are not supported by substantial evidence and to correct errors of law. *See Dellolio*, 705 F.2d at 125. But to make a finding that substantial evidence does not exist, a court must conclude that there is a "conspicuous absence of credible choices" or "no contrary medical evidence." See *Johnson v. Bowen*, 864 F.2d 340 (5th Cir. 1988); *Dellolio*, 705 F.2d at 125.

B. <u>The ALJ's improper evaluation of Dr. Holmes's opinion was not a harmless error.</u>

Under the current regulations, rather than assigning weight to the medical opinions, the Commissioner must articulate "how persuasive" he finds the medical opinions. *Jones v. Comm'r of Soc. Sec. Admin.*, No. 22-CV-01055, 2022 WL 3509035, at *7 n.5 (W.D. La. 2022), *report and recommendation adopted*, 2022 WL 3448676 (W.D. La. 2022) (citing 20 C.F.R. § 416.920c(b)). And the Commissioner's consideration of the persuasiveness of medical opinions is guided by the following factors: (1) supportability; (2) consistency; (3) relationship with the claimant (including the length of the treatment relationship, the frequency of examinations, the purpose of the treatment relationship, the extent of the treatment relationship, and the examining relationship); (4) specialization of the medical source; and (5) any other factors that tend to support or contradict the opinion. *See Jones*, 2022 WL

3509035, at *7 n.5 (citing 20 C.F.R. § 404.1520c(c)(1)–(5); 20 C.F.R. § 416.920c(c)(1)–(5)).

"Supportability" and "consistency" are the most important factors. *See Jones*, 2022 WL 3509035, at *7 n.5 (citing 20 C.F.R. § 404.1520c(b)(2); 20 C.F.R. § 416.920c(b)(2)). "Supportability" looks to "the objective medical evidence and supporting explanations presented by a medical source [] to support his . . . medical opinion(s)." 20 C.F.R. § 404.1520c(c)(1). "Consistency" looks to how "consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources in the claim." 20 C.F.R. § 404.1520c(c)(2). The ALJ must explain these two factors, but he need not expound on the remaining three unless he finds that two or more non-identical medical opinions are equally well-supported and consistent with the record. *See Jones*, 2022 WL 3509035, at *7 n.5 (citing § 416.920c(b)(2)–(3)).

Redmond argues the ALJ committed legal error when evaluating the opinion. of Dr. Tosheiba Holmes, M.D., ("Dr. Holmes") because he "fail[ed] to satisfy the minimum articulation requirements mandated by the applicable regulations." ECF No. 12 at 4–5. The Court ultimately agrees that the ALJ erred and further finds such error was not harmless.

### i. The ALJ did not properly consider Dr. Holmes's opinion.

Dr. Holmes opined that Trahan could only walk occasionally—up to 1/3 total of an eight-hour workday—and had "a limited ability to bend or stoop." ECF No. 9-1 at 318. Dr. Holmes further found that Trahan "was able to ambulate, had difficulty,

but did not require assistive device." *Id.* The ALJ found Dr. Holmes's opinion to be somewhat persuasive, stating:

> Dr. Holmes is a licensed physician and an acceptable medical source. He has expert program knowledge of the Social Security Administration disability assessment program rules and criteria. His examination findings supported his opinion, and his opinion was somewhat consistent with the medical evidence of record. However, his support was eroded because [he did] not provide a function-by-function analysis of vocational limitations in certain matters, such as whether the claimant has limitations in lifting/carrying or postural activities. For these reasons, the undersigned finds that the opinion of Dr. Holmes was only somewhat persuasive as a whole.

*Id.* at 29.

Trahan argues the ALJ erred because he did not adequately articulate the supportability and consistency factors. ECF No. 12 at 4–8. Regarding consistency, Trahan asserts that the ALJ failed to identify or discuss the evidence that "purportedly detracted" from Dr. Holmes's opinion. *Id.* at 6. Regarding supportability, Trahan failed to explain how "the opined walking limitation was neither supported by Dr. Holmes's report nor the objective medical evidence." *Id.* at 7–8. Trahan maintains that "the ALJ's analysis is, at best, confusing, such that this reviewing Court cannot determine if the ALJ's rejection of Dr. Holmes's opined walking limitation is supported by substantial evidence." ECF No. 17 at 2.

The Court agrees the ALJ erred. "[A]n 'ALJ is not always required to do an exhaustive point-by-point discussion' of the evidence []he reviews." *Silva v. Kijakazi*, No. 22-51045, 2023 WL 3723628, at *1 (5th Cir. May 30, 2023) (quoting *Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007)). However, the ALJ's explanation "must 'enable[] the court to undertake a meaningful review of whether his finding with

regard to the particular medical opinion was supported by substantial evidence' and must not 'require the [c]ourt to merely speculate about the reasons behind the ALJ's persuasiveness finding or lack thereof.'" *Probst v. Kijakazi*, No. 22-CV-00286, 2023 WL 3237435, at *4 (W.D. Tex. May 3, 2023) (alteration original) (quoting *Cooley v. Comm'r of Soc. Sec.*, 587 F. Supp. 3d 489, 499 (S.D. Miss. 2021)). Courts in this circuit have found that this standard requires "a discernible logic bridge between the evidence and the ALJ's persuasiveness finding." *Collar v. Comm'r of Soc. Sec.*, No. 22-CV-1026, 2024 WL 737306, at *6 (M.D. La. Jan. 22, 2024) (quotations omitted), *report and recommendation adopted*, No. 22-CV-1026, 2024 WL 735375 (M.D. La. Feb. 22, 2024).

Here, the Court cannot draw the requisite logic bridge. The ALJ generally discussed the supportability and consistency of Dr. Holmes's opinion and explained why he rejected certain "vocational limitations . . . , such as . . . limitations for lifting/carrying, or for postural activities." ECF No. 9-1 at 29. But this proffered explanation does not account for the rejection of the walking limitation. Put differently, the ALJ explained why he found unpersuasive some portions of Dr. Holmes's opinion—that is, the opined lifting/carrying limitations and postural activities limitations—but failed to explain why the walking limitation was not persuasive. This lack of explanation prevents the Court from determining whether the ALJ's decision is supported by substantial evidence. That is error.

The Commissioner's attempt to point to other evidence in the record to support the omission of the limitation does not disturb the Court's conclusion. For example,

15

The Commissioner cites the finding by Dr. Emily Eisenhauer, M.D. ("Dr. Eisenhauer") that Trahan "could stand and/or walk for a total of about six hours in an eight-hour workday." ECF No. 16 at 6. However, as noted by the Commissioner, the ALJ found this opinion "somewhat persuasive as a whole" because Dr. Eisenhauer was not a treating or examining source and "did not have the opportunity to review new medical evidence received at the hearing level." ECF No. 9-1 at 30. The ALJ did not discuss any specific finding, including Dr. Eisenhauer's walking limitation finding. Therefore, contrary to what the Commissioner seems to imply, this portion of the ALJ's discussion does not suggest that the ALJ found Dr. Eisenhauer's walking limitation finding more persuasive than Dr. Holmes.

The Commissioner's reliance on the ALJ's findings regarding the efficacy of Trahan's treatments is similarly misplaced. When detailing Trahan's treatments and the efficacy thereof, the ALJ did not remark at all on Trahan's ability to walk. Thus, this section, as written, does not necessarily support that the record is inconsistent with Dr. Holmes's opinion on walking limitation.

In sum, because the ALJ failed to adequately articulate the supportability and consistency factors when evaluating Dr. Holmes's opinion, the ALJ erred.

### ii.  The ALJ's error was not harmless.

"Procedural perfection in administrative proceedings is not required. Th[e] court will not vacate a judgment unless the substantial rights of a party have been affected." *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988). "Remand is required only when there is a realistic possibility that the ALJ would have reached a different

16

conclusion absent the procedural error." *Wilder v. Colvin*, No. 13-CV-3014, 2014 WL 2931884, at *5 (N.D. Tex. June 30, 2014). The claimant bears the burden of showing that the ALJ's error was prejudicial. *Jones v. Astrue*, 691 F.3d 730, 734 (5th Cir. 2012).

Trahan argues the ALJ committed a harmful error because Dr. Holmes opined that walking limitation "is conducive to sedentary, rather than light work." ECF No. 12 at 8. Therefore, Trahan maintains that the ALJ "failed to carry his burden at step five to prove that there is work in the national economy that Trahan can perform." *Id.* at 9.

The Court agrees. A proper evaluation of Dr. Holmes's opinion could lead to a more limited residual functional capacity determination. Moreover, the proffered occupations are classified as light work. ECF No. 9-1 at 32. Jobs classified as light work may "require[] a good deal of walking or standing." 20 C.F.R. § 404.1567(b). The VE was not asked to consider what occupations a person with Dr. Holmes's opinion of walking limitation could perform. As such, it is not clear that the VE would have testified that Trahan could have performed the proffered occupations. If the opined limitation were to be included in the residual functional capacity, a different result could be reached. Therefore, this error is not harmless.

Trahan's case should be remanded for a proper evaluation of Dr. Holmes's opinion, including his opinion that Trahan could only walk occasionally. If the ALJ modifies Trahan's residual functional capacity upon proper reconsideration of Dr. Holmes's opinion, further evidence from the VE may be necessary.

III.    Conclusion

Because the ALJ committed a harmful legal error, IT IS RECOMMENDED that Trahan's appeal (ECF No. 1) be GRANTED, the final decision of the Commission be VACATED, and the case be REMANDED for further proceedings consistent with this opinion.

Under 28 U.S.C. § 636(b)(1)(c) and Fed. R. Civ. P. 72(b), a party may file written objections to this Report and Recommendation within 14 days of service, unless the Court grants an extension of time to file objections under Fed. R. Civ. P. 6(b). A party may also respond to another party's objections to this Report and Recommendation within 14 days of service of those objections, again unless the Court grants an extension of time to file a response to objections.

No other briefs may be filed without leave of court, which will only be granted for good cause. A party's failure to timely file written objections to this Report and Recommendation will bar a party from later challenging factual or legal conclusions adopted by the District Judge, except if the challenge asserts "plain error."

SIGNED on Monday, May 11, 2026.

JOSEPH H.L. PEREZ-MONTES
UNITED STATES MAGISTRATE JUDGE